UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT M. EATON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 18-11824-LTS |
| ) | |
| TOWN OF TOWNSEND, JAMES. M. ) | |
| KREIDLER, and GORDON CLARK ) | |
| ) | |
| Defendants. ) | |
| ) | Consolidated with |
| ) | |
| ROBERT M. EATON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 20-40094-LTS |
| ) | |
| CINDY KING and CAROLYN SMART ) | |
| ) | |
| Defendants. ) | |
| ) | |

MEMORANDUM AND ORDER ON THE PENDING
MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 118, 122, 126, 129)

March 30, 2022

SOROKIN, J.

Robert Eaton filed the present lawsuit against the Town of Townsend ("Townsend"),

James Kreidler, and Gordon Clark in state court alleging various claims arising from his

employment as the Police Chief of Townsend.  The Defendants subsequently removed the action

to federal court on the basis of federal question jurisdiction.  Doc. No. 1.[1]  The parties filed a

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.

joint motion to consolidate this case with Eaton's related lawsuit against Cindy King and Carolyn Smart, Doc. No. 89, which the court allowed, Doc. No. 90.[2]  Now pending before the Court are the Defendants' Motions for Summary Judgment.  After a careful review of the parties' submissions and arguments, the Court ALLOWS the Defendants' Motions for Summary Judgment.

I.      BACKGROUND

        The Court recites the facts according to the familiar summary judgment standard with additional facts discussed, as appropriate, in the course of the Court's analysis of the legal claims.  The Court notes at the outset that Eaton has submitted a sprawling affidavit spanning fifty pages and 134 paragraphs.  See Eaton Aff., Doc. No. 157-66.[3]  Portions of Eaton's affidavit recite matters of which Eaton patently lacks personal knowledge, such as the state of mind or intent of other persons.  Id.  While the Court accepts as true those matters of which Eaton possesses personal knowledge, the Court disregards the affidavit insofar as it contains inadmissible information.

        The legislative powers of Townsend are vested in a Town Meeting open to all registered voters.  Doc. No. 163-1 at 3 ¶ 1.  Townsend's three-member Board of Selectman ("BOS") holds executive powers and has authority to establish Town policies.  Id.  The Town Charter further provides that "[n]othing in this section shall be construed to authorize any member of the Board

---

[2] Before the actions were consolidated, Townsend, Kreidler, and Clark moved to dismiss the Plaintiffs' Amended Complaint.  Doc. No. 25.  The Court allowed this Motion in part, dismissing the Plaintiff's Massachusetts Civil Rights Act claim (Count VIII) as well as his 42 U.S.C. § 1983 claim (Count VII) insofar as it asserted a claim for a violation of Eaton's First Amendment rights and insofar as it asserted a claim for a violation of Eaton's right to due process against Kreidler. See Doc. No. 44 at 17.

[3] The parties have submitted both unredacted and redacted versions of the relevant filings. Throughout this Order, the Court cites to the unredacted versions of the papers to which it refers.

of Selectmen, nor a majority of such members, to become involved in the day-to-day administration of any town agency."  Doc. No. 119-66 at 8.  At all times relevant to the present case, the Townsend Board of Selectmen was comprised of Carolyn Smart, Gordon Clark, and Cindy King.  Doc. No. 163-1 at 3 ¶ 1.

Eaton was working as the Chief of Police for the town of Stockbridge when he learned that Townsend was seeking candidates for Chief of Police of the Townsend Police Department ("TPD").  Eaton Aff., Doc. No. 157-66 ¶ 5.  He decided to apply for the position and first interviewed on February 2, 2016.  Id. at ¶ 6.  On February 9, 2016, the BOS, without Clark, interviewed Eaton in a public meeting.  Id. ¶ 8.  As explained infra at 6-7, Clark was not present at Eaton's February 9 interview due to his recusal from the hiring process.  Id.  During an executive session after the interview, Eaton met with Smart and King and informed them that he had previously been diagnosed with Post Traumatic Stress Disorder ("PTSD").  Id. ¶ 11.[4]  Eaton submitted to a pre-employment psychological evaluation as part of the hiring process, id. ¶ 16, and signed a form authorizing the release of the evaluation to the Townsend Town Administrator and his designates, Doc. No. 157-6.

Eaton was appointed by the BOS to serve as Police Chief on March 24, 2016, and his three-year contract of employment became effective on May 2, 2016.  Doc. No. 163-1 at 5 ¶ 4.  Nothing in the record suggests that Eaton then sought any reasonable accommodation (or, for that matter, any accommodation) for his PTSD to perform his duties as the Chief of Police.  Pursuant to Eaton's employment contract, the Chief was tasked with "administer[ing] the Police and Communications Departments under the direction of the Board in accordance with

---

[4] Eaton informed Clark of his diagnosis during a meeting on April 26, 2016.  Eaton Aff., Doc. No. 157-66 ¶ 20.

M.G.L.c.41, Section 97A,"[5] serving as "the commanding officer of all police and communications personnel," and directing "all law enforcement and communication activities of the Town."  Doc. No. 157-7 at 4.  The contract required the Chief to "perform his duties in accordance with the job description dated September 4, 2001."  Id. at 7.  Despite this reference to a job description dated September 4, 2001, on April 26, 2016, Eaton signed a form acknowledging his receipt of the job description "as revised on March 25, 2012 covering essential functions" of the position.  Doc. No. 157-9 at 2.  While the 2012 version of the job description states that the Chief of Police shall "work under policy direction of the Board of Selectmen and administrative direction" of the Town Administrator, Doc. No. 157-10 at 2, the 2001 version excludes the reference to the Town Administrator, Doc. No. 157-8 at 3.  Eaton claims that he believed his employment was governed by the 2001 job description.  Doc. No. 156-66 ¶ 19.  The record establishes that, in the course of Eaton's service as Chief of Police, he:

---

[5] The full text of M.G.L. ch. 41 § 97A, which the parties occasionally refer to as the "Strong Chief statute," states:

> In any town which accepts this section there shall be a police department established by the selectmen, and such department shall be under the supervision of an officer to be known as the chief of police. The selectmen of any such town shall appoint a chief of police and such other officers as they deem necessary, and fix their compensation, not exceeding, in the aggregate, the annual appropriation therefor. In any such town in which such appointments are not subject to chapter thirty-one, they shall be made annually or for a term of years not exceeding three years, as the selectmen shall determine, and the selectmen may remove such chief or other officers for cause at any time after a hearing. The chief of police in any such town shall from time to time make suitable regulations governing the police department, and the officers thereof, subject to the approval of the selectmen; provided, that such regulations shall become effective without such approval upon the failure of the selectmen to take action thereon within thirty days after they have been submitted to them by the chief of police. The chief of police in any such town shall be in immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders. Section ninety-seven shall not apply in any town which accepts the provisions of this section. Acceptance of the provisions of this section shall be by a vote at an annual town meeting.

reported regularly to the Town Administrator, had some direct communication with the BOS and its members, and did not contend that this arrangement violated his contract by imposing the 2012 job description upon him when his contract arguably imposed the 2001 job description. The Court need not resolve the question of which job description governed as Eaton has not alleged a breach of contract arising out of the reporting arrangements, nor has he contended his contract freed him from communicating with the Town Administrator. At all times relevant to this action, the Town Administrator was Defendant James Kreidler.

Eaton's employment contract also established a detailed process for the Chief's oversight and, if it became necessary, removal. Pursuant to the contract's terms, the Town "recognizes its obligation to provide the Chief with periodic performance evaluations." Doc. No. 157-7 at 2. The contract provided for a "post probation period base salary increase" of $5,000 "subject to an affirmative vote of the Board after a six month performance review." Id. The Town was entitled to "remove the Chief for just cause by vote of a majority of the members of the Board after a hearing." Id. at 5. The definition of just cause is broad and includes: "[c]onviction of the Chief of any crime (whether a felony or misdemeanor) involving moral turpitude, malfeasance, misfeasance or misprison in office," "[f]ailure to administer and manage the Police Department in an efficient and responsible manner," "[f]ailure after written warning to carry out the duties and responsibilities of Chief," and "[a]ny other just cause." Id. at 6.

The following procedural protections governed removal proceedings:

- "The Chief of Police shall have the option of choosing whether or not any such hearing shall be closed to the public or held as an open or public hearing." Id. at 5.
- "In all phases of disciplinary action the Chief shall have the right to be represented by counsel at his own expense." Id.
- "In all phases of disciplinary action the Chief shall be given at least ten (10) business days prior written notice, which will include an explanation of the action being taken, the cause therefore, the date(s) and time(s) of all alleged offenses or violations of the contract, and the date and time of the hearing." Id. at 6.

- "After any hearing the Board must make a written report of the evidence presented and its findings of fact.  No evidence may be relied upon which was not produced at the hearing." Id.
- "A right of appeal shall exist to the Superior Court of the Commonwealth of Massachusetts." Id. at 4.

On April 26, 2016, Eaton met with Clark.  Eaton Aff., Doc. No. 157-66 ¶ 20.  This meeting occurred after the BOS hired Eaton, but before he commenced service as the Chief of Police of Townsend.  Clark "stated his desire and intention of demoting Lieutenant Mark Giancotti, transferring a Sergeant to midnights, not promoting Dispatcher Rebecca Borneman, and closing the Communication Center." Id.  The record does not reveal the reasons, if any, expressed at that time by Clark for his request; however, in the fall of 2015, Clark's wife, an employee of the TPD had had an "altercation" with Borneman.  See infra at 6-7.  Clark made similar requests repeatedly throughout Eaton's tenure as Chief, and Eaton continually refused to comply.  See Doc. No. 163-2 at 50, 57-59 ¶¶ 13, 29.  In this April 26 meeting, Clark explained that all "other information about the TPD and its personnel would be provided to [Eaton] through Kreidler because [Clark] wanted to reduce his exposure and prevent anything coming back on him." Eaton Aff., Doc. No. 157-66 ¶ 20.

On May 5, 2016, Eaton met with Kreidler.  Id. ¶ 22.  Eaton informed Kreidler that he desired to meet with the BOS once a month to provide it with updates concerning the TPD.  Id. Kreidler responded that "there was no need" because all Town Department Heads report to him and he "acts like a filter to the BOS." Id.  Kreidler also told Eaton that his management style was inspired by Machiavelli's "The Art of War." Id.

In late June, Kreidler asked Eaton to attend the exit interview of Clark's wife, Patricia Clark ("Patricia").  Id. ¶ 25.  Patricia was scheduled to retire that July after working for the TPD for 27 years.  Id. ¶ 25; Doc. No. 163-2 at 7 ¶ 7.  Previously, in October 2015, Patricia was placed on administrative leave after having an "altercation" with police dispatcher Rebecca Borneman.

Eaton Aff., Doc. No. 157-66 ¶ 26; Doc. No. 162-2 at 9 ¶ 14.  This incident prompted Patricia to

file a MCAD complaint against the Town on January 11, 2015.  Doc. No. 157-1.  Pursuant to

conflict-of-interest laws, Clark thereafter recused himself from certain matters regarding the TPD

during his wife's employment, including Eaton's appointment to the Chief position.  See Doc.

No. 163-2 at 9-11 ¶¶ 16-19; Eaton Aff., Doc. No. 157-66 ¶¶ 8-9.  During her exit interview,

Patricia "expressed her displeasure" with various TPD employees involved in the October 2015

incident, including former Police Chief Erving Marshall, Lieutenant Mark Giancotti, Sergeant

John Johnson, Administrative Assistant Samantha Watson-Morris, and Dispatcher Rebecca

Bornman.  Eaton Aff., Doc. No. 157-66 ¶ 26.

      At some point during the hiring process, Eaton learned that a movement initiated by

Town residents demanding a recall of Clark and Smart from the BOS created a "toxic political

environment" in Townsend.  Id. ¶¶ 28-29.  On June 29, 2016, Kreidler asked Eaton to issue a

press release exonerating him from accusations of improper behavior by two members of the

recall movement.  Id. ¶¶ 28-30.  When Eaton refused to comply with Kreidler's demands, the

two had a dispute.  Id.  In August, Smart became angry with Eaton due to his failure to take

action against a citizen who criticized her on social media and her suspicion that the TPD was

collaborating with the recall movement.  Doc. No. 163-2 at 55 ¶¶ 25-26; Doc. No. 157-21; Doc.

No. 157-22; see also Doc. No. 163-2 at 64 ¶ 40 (describing a November conversation between

Eaton and Smart during which Smart accused Eaton of supporting the recall movement).

      Eaton had frequent meetings with Kreidler during which, he alleges, Kreidler asked him

to make personnel changes at the TPD, requested information about the recall movement,

expressed "concerns [Kriedler] said Smart and Clark had with current and former members of

the TPD," "[made] scandalous accusations against former Police Chief Marshall and Former

Police Chief DeMoura," "[made] repeated complaints" about various TPD employees, and "[said] that Clark was not happy that [Eaton] had not demoted Lieutenant Giancotti."  See Eaton Aff., Doc. No. 157-66 ¶¶ 35, 56; Doc. No. 163-2 at 52 ¶ 20.  Eaton attributes Kreidler's actions to a desire to retaliate against the recall movement and the police officers involved in Patricia's placement on administrative leave.  See Eaton Aff., Doc. No. 157-66 ¶¶ 35-37, 56.  When Eaton refused to implement Kreider's requested changes to the TPD, Eaton alleges that Kreidler "harassed" and "retaliated" against him.  See id. ¶ 37.  The record reveals that the conduct that Eaton describes as harassment and retaliation consisted of Kreidler "insinuating that the BOS was not happy with [Eaton's] performance,"[6] repeating his demands during frequent, hours-long meetings, and, per Eaton, playing a role in the BOS's ultimate decision to fire Eaton.  See id. ¶¶ 37, 56.

On September 12, 2016, Eaton met with Clark and Kreidler.  Id. ¶ 43.  Clark repeated his request that Eaton make personnel changes at the TPD, stating that "he wanted his pound of flesh out of [former] Chief Marshall."  Id.  After Kreidler stepped out, Eaton told Clark that he was concerned that his interactions with Kreidler might cause his PTSD to worsen.  Id. ¶ 43; Doc. No. 163-2 at 57-59 ¶ 29.  After this meeting, Eaton informed the BOS that Clark and Kreidler were interfering with his day-to-day oversight of the police department by pressuring him to take retaliatory actions against various TPD officers.  Eaton Aff., Doc. No. 157-66 ¶ 44.  Eaton also informed King and Smart that Kreidler and Clark's conduct was "affecting his mental health and causing his PTSD symptoms to worsen."  Doc. No. 163-2 at 59 ¶ 30.

---

[6] When Eaton later asked Smart whether the BOS was unhappy with his performance, she said, according to Eaton, that she was not aware of any issues.  Doc. No. 163-2 at 56 ¶ 27.

In October 2016, Eaton met with Smart and informed her that he had received a package of information from an officer who wished to remain anonymous concerning Kelly Merrill and her boyfriend, Adam Cotty.  Eaton Aff., Doc. No. 157-66 ¶ 46; Doc. No. 157-26; Doc. No. 163-1 at 7 ¶ 10.  For purposes of summary judgment, the Court accepts, based on Eaton's affidavit, that he did not tell Smart that such information arrived anonymously, but only that the source requested anonymity.  Eaton Aff., Doc. No. 157-66 ¶ 46.  Nonetheless, there is evidence that some town officials understood the information to have arrived anonymously.  See Doc. No. 157-27 at 2 (stating that the "information given to [Eaton] anonymously included a reference to a child care issue" in an email from the Town Counsel to Eaton).  Moreover, there is no evidence before the Court that Eaton corrected this misimpression.  To the extent relevant, the Court addresses these facts in the course of the legal analysis that follows.

Kreidler had recently hired Merrill to serve as his administrative assistant.  Eaton Aff., Doc. No. 157-66 ¶ 46.  The package given to Eaton contained an internal database report concerning Merrill and a copy of a Criminal Offender Record Information (CORI) report from the Massachusetts Criminal Justice Information System ("CJIS") for Adam Cotty run on October 11, 2016 by Sergeant Girard.  Id.; Doc. No. 157-26 at 9.  Eaton informed Smart that the TPD performed a well-being check on Merrill due to drug use in December 2015, and that Cotty had "numerous convictions and was on parole."  Eaton Aff., Doc. No. 157-66 ¶ 46.  Eaton says, and the Court accepts, that he did not share the documents provided to him with Smart.  Id.

After her meeting with Eaton, Smart got in touch with Townsend Town Counsel, David Jenkins, to determine whether this CJIS inquiry was lawful.  Doc. No. 163-1 at 9 ¶ 15.  After Smart's initial inquiry, the BOS directed Jenkins to investigate possible unlawful use of the CJIS system by the TPD.  Doc. No. 163-1 at 10 ¶ 17; Jenkins Dep., Doc. No. 119-73 at 84:10-16.  The

parties agree and the record establishes that the BOS is empowered to conduct investigations such as this one pursuant to M.G.L. ch. 41 § 23B and Section 3-2(e) of the Townsend Town Charter. Doc. No. 163-1 at 9-11 ¶¶ 16-17. Numerous contemporaneous statements made during the course of these events indicate that the BOS authorized Jenkins to conduct the CJIS investigation, including: a January 31, 2017 email from Jenkins, an attorney at Kopelman and Paige, to Eaton so stating (Doc. No. 119-77 at 2), a Town press release issued on November 23, 2016 stating that "Town Counsel has been empowered to address all pending matters in the Townsend Police Department and the Chief has been directed to immediately comply with all of Counsel's directives" (Doc. No. 119-81), and another Town press release issued on February 10, 2017 stating that Eaton was on administrative leave and discussing the investigation (Doc. No. 157-49). Nothing in Eaton's extensive affidavit or the record before the Court indicates that Eaton or anyone else either contended, at the relevant time, that the investigation was unauthorized, or sought proof of a vote by the BOS authorizing the investigation.

However, the Plaintiff now disputes whether the investigation was lawfully authorized by a vote of the BOS in a public or executive session, noting that there is no mention of such an authorization in the 2015 through 2017 Townsend Annual Reports. See Eaton Aff., Doc. No. 157-66 ¶ 124 ("I have reviewed the Townsend Annual Reports for 2015, 2016, and 2017 and there is no mention of the BOS authorizing any investigation under M.G.L. c. 41 §23B or Section 3-2(e) of the Town Charter nor are there any reports of such an investigation."). Eaton also contends that no witness states that the BOS took such a vote. Doc. No. 154-1 at 7. The Court finds that the uncontradicted assertions concerning the investigation contained in Jenkins' email and Town press releases establish that: (1) that the BOS authorized the investigation whether through a lawful vote or an informal agreement; (2) the BOS ordered Jenkins to conduct

the investigation; and (3) Eaton was aware of this investigation as well as the BOS's authorization of it.

On November 16, 2016, Jenkins informed Eaton that TPD personnel had run certain CORI checks for no lawful police purpose. Eaton Aff., Doc. No. 157-66 ¶ 49; Doc. No. 163-1 at 11 ¶ 18. In response, Eaton told Jenkins that he "believed the information [he] provided to Smart was in the best interest of the community, that public employees have to be held to a higher standard and they must be properly vetted to be trusted." Eaton Aff., Doc. No. 157-66 ¶ 49. In an email, Jenkins explained to Eaton that he understood Eaton to have taken the position that the TPD could, on its own initiative, investigate civilian employees of the Town by running CORI checks on them. Doc. No. 119-77 at 2. Jenkins stated his considered legal opinion, supported by citation to guidance from the Massachusetts Police Chiefs Association, that Eaton's position regarding the lawfulness of the CORI checks was incorrect. Id. There is no record of Eaton responding to Jenkins' email, nor does Eaton's affidavit state that Eaton explained to Jenkins that he did not take the position that the TPD could conduct such investigations into civilian employees. Eaton's affidavit does state, and Court thus accepts, that Eaton never told Jenkins that the TPD could investigate civilian town employees. Eaton Aff., Doc. No. 157-66 ¶ 50.

On November 19, 2016 Eaton had a call with Smart, during which he told her that Kreidler had "created a toxic work environment that was interfering with [his] work and was harming [his] health and that [his] PTSD symptoms were worsening as a result of [Kreidler's] harassment." Id. ¶ 54. Eaton also asked Smart for a reasonable accommodation to report directly to the BOS instead of Kreidler. Id. After the call, Smart sent Eaton an email, which stated:

> After I got off the phone, I starting [sic] thinking. I know we both vented about our
> feelings regarding the difficulties and challenges we are both facing, I just want to

11

be absolutely sure that is what our conversation was about. The reason I say that, you did express how recent events may be affecting your health and you feel like you're working in a hostile environment with the demands of the community in regards to the town administrator. We both know those are key words managers have to pay attention to and I just wanted to be sure we were just sharing our thoughts and it was not a sign to me that I should be doing something else liking [sic] referring it to our EAP program or something like that. I want you to feel comfortable venting or expressing your frustration and trusting of me in that regard but I just want to be sure I am not doing the wrong thing by just keeping it between us.

Doc. No. 157-28.  The Defendants contend that Eaton never responded to Smart's follow-up email.  Doc. No. 163-1 at 26 ¶ 43.  Though Eaton disputes this assertion, he does not provide any evidence that he responded.  See Eaton Aff., Doc. No. 157-66 ¶ 55.  Eaton also contends that he requested a reasonable accommodation to report to BOS "repeated[ly]," but, once again, fails to provide detail regarding the substance or timing of these requests.  Id.

Eaton met with the BOS in an executive session on November 22, 2016 during which they planned to discuss Eaton's six-month performance review and eligibility for a $5,000 bonus.  Id. ¶ 64.  At the beginning of the meeting, Smart informed Eaton that the BOS had been advised by Jenkins to "not address [the bonus or performance review] tonight" in light of Jenkins' investigation.  Doc. No. 157-30 at 1.  Eaton contends that Smart's statement was a "lie" because Jenkins had not in fact advised the BOS to table the performance review discussion.  See Doc. No. 148-1 at 15-17.  Eaton also characterizes the BOS's decision to shelve the performance review as a "malicious" act orchestrated by Kreidler in response to Eaton's decision to raise concerns about Kelly Merrill's employment.  Id.  The record establishes the following facts:

- Jenkins spoke with Kreidler in advance of the BOS meeting to discuss the issue of the bonus.  Doc. No. 119-73 at 103:11-105:5.  Though Jenkins informed Kreidler that giving the Chief a raise would be an "acknowledgement that the Chief's performance was satisfactory" despite the ongoing CJIS investigation, he did not advise expressly against having a discussion with Eaton about the bonus.  Id.
- Prior to the meeting, Kreidler suggested telling Eaton that he is likely entitled to the bonus based on his performance, but that the BOS had been advised against taking up the

bonus that evening.  Doc. No. 157-30 at 1.  Smart overruled Kreidler, deciding that they should "say what counsel told us and nothing else."  Id.

Based on the record, the Court finds no factual basis for Eaton's contention that the BOS "lied" to Eaton about Jenkins' advice.  To "lie" is to "make an untrue statement with intent to deceive." Lie, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/lie.  Smart's statement was not a "lie."  Though Jenkins may not have expressly counseled the BOS against having any discussion at all, he did advise that granting the bonus would communicate satisfaction with Eaton's performance notwithstanding the ongoing investigation.

After Smart informed Eaton that they would not discuss his bonus, tensions rose.  Eaton asked if he was under investigation to which Smart responded, "[n]o. Not that I am aware of." Eaton Aff., Doc. No. 157-66 ¶ 64.  In response, Eaton then placed his badge and duty hat on the BOS's table, stated "here you go. Is this what you want?", and left the meeting.  Id.  The next day the BOS issued a press release announcing Eaton's resignation.  Doc. No. 157-32.  After Eaton stated that he had not intended to resign the night before, the Town issued a new press release clarifying the record.  Doc. No. 119-81.  It also stated that "Town Counsel has been empowered to address all pending matters in the Townsend Police Department and the Chief has been directed to immediately comply with all of Counsel's directives."  Id.

Shortly after these events, the BOS hired Frederick Ryan, a former Arlington Police Chief, as a moderator and executive coach to help Eaton succeed in his role as Chief of Police. Doc. No. 119-96; Doc. No. 163-2 at 28 ¶ 52.  As part of his work, Ryan met with Eaton as well as members of the BOS.  Doc. No. 119-96 at 2-4.

At some point, Eaton began his own investigation into the CJIS matter.  In a memorandum from Eaton to the BOS dated December 15, 2016, Eaton informed the BOS that he was "actively investigating the misuse of the [CJIS] by several department employees."  Doc.

No. 163-2 at 75 ¶ 60; Doc. No. 157-38.  According to Eaton, the BOS neither informed him that it had tasked Jenkins with the CJIS investigation nor ordered Eaton to halt his own investigation in response to his memorandum.  Doc. No. 163-2 at 75 ¶ 60.  Whether or not BOS specifically informed Eaton of the investigation by Jenkins in response to this particular communication, the undisputed evidence establishes that Eaton became aware of the investigation from direct communications with Jenkins about it.  See Doc. Nos. 119-68 at 121:1-10; Doc. No. 119-77; Doc. No. 119-78.

On November 28, 2016, TPD Sergeant Randy Girard received a Disciplinary Action Investigation Notice of Rights and Responsibilities arising from the CJIS inquiries run on Adam Cotty and Kelly Merrill.  Doc. No. 156-14 ¶ 17; Doc. No. 156-2.  The Notice was issued by Eaton.  Doc. No. 156-2.  After seeking the advice of a lawyer, Girard sent a written notice to Eaton invoking his Fifth Amendment Rights.  Doc. No. 156-14 ¶ 20.  Girard appeared for an interview about the CJIS investigation on December 15, 2016.  Id. ¶ 26.  Girard gave Eaton a written explanation of the CORI checks he ran on October 11 shortly before the interview.  Id. ¶ 24.  During the interview, Kreidler gave Girard a Notice of Administrative Leave and informed him that the BOS planned to terminate his employment unless he voluntarily resigned.  Id. ¶ 27.  Girard decided to resign shortly thereafter but maintains that his conduct was lawful.  See id. ¶¶ 32-33.  According to Eaton and Girard's affidavits, Kreidler also raised the possibility that Girard would be criminally prosecuted and reported to the State Ethics Commission.  Id. ¶ 27; Eaton Aff., Doc. No. 157-66 ¶ 83.  In Girard's affidavit submitted for summary judgment, he

contends that he ran lawful CJIS inquiries on Merrill and Cotty only on October 11, 2016.[7]  Doc. No. 156-14 ¶ 18.

Eaton observed that "Kreidler's harassment towards [him] noticeably intensified" after he asked Smart for a reasonable accommodation to report to the BOS.  Eaton Aff., Doc. No. 157-66 ¶ 57.  Eaton points to one specific instance of such conduct, which occurred during a meeting that he had with Smart and Kreidler on January 18, 2017.  The purpose of the meeting was to discuss negative social media comments from community members about BOS and Kreidler.  Doc. No. 163-2 at 77-78 ¶ 63.  During the conversation, Smart accused the TPD of spying on people and Eaton of "acting crazy."  Id.  Kreidler told Eaton that he "would have already fired [Eaton]," called Eaton "insane," and expressed concerns regarding Eaton's emotional stability.  Id.; Doc. No. 119-68 at 172:1-20.

On January 26, 2017, Eaton received a cease-and-desist letter from Patricia's lawyer ordering Eaton to stop making untrue statements about Patricia and warning him that "the Clarks have instructed me to pursue all available avenues for vindicating her."  Doc. No 163-2 at 77 ¶ 65; Doc. No. 157-41 at 2-3.

Jenkins' investigation revealed evidence suggesting that Eaton had informed TPD Officer Rochette that Eaton was working on a written report that would exonerate Rochette and all of the other officers involved in the allegedly unlawful CJIS inquiries.[8]  Doc. No. 157-42 at 3-6.  In an email dated January 24, 2017, Jenkins inquired whether Eaton had made such a statement to

---

[7] As explained infra at 16, the October 11, 2016 CORI inquiry was later confirmed to be lawful by a Department of Criminal Justice Information Services report. The DCJIS report did not reach the same conclusion regarding the September 27 CORI inquiry.  The record does not resolve the identity of the officer who ordered that inquiry.

[8] During his investigation, Jenkins occasionally directed Eaton to provide certain information, including a CJIS audit, which Eaton provided (sometimes after multi-day delays).  See Doc. No. 163-1 at 11-12 ¶¶ 19-22.

Rochette.  Id. at 6.  Eaton confirmed that he had indeed made the statement in an email to

Jenkins dated January 30, 2017.  Id. at 3.  Jenkins then emailed Eaton on January 31, 2017,

saying:

> I have emphasized to you that this investigation was being conducted by me upon
> the vote of BOS. Since that time I have attempted to comply with the BOS
> instruction to investigate this matter. I learned through the interview with Officer
> Rochette that you are apparently conducting a concurrent investigation and that you
> advised the officer before the investigation that he was to be cleared by your
> investigation. By this email I am advising you to discontinue your separate
> investigation and to immediately turn over to me any information that you have
> derived from this investigation which has not been preciously [sic] given to me.
> You are not to take any further action which could interfer [sic] with the
> investigation being conducted.

Id. at 2-3.  Whether Jenkins had the legal authority to prevent Eaton from continuing his own

investigation is a legal question that the Court need not answer to resolve the pending Motions.

The facts do establish that Eaton did not comply with this request from Jenkins and instead

continued his parallel investigation.  Doc. No. 163-2 at 30 ¶ 56.

On February 8, 2017, Eaton received a report from the Department of Criminal Justice

Information Services ("DCJIS") that he had requested regarding the lawfulness of the TPD's

CJIS transactions.  Eaton Aff., Doc. No. 157-66 ¶ 98.  The DCJIS found no improper CJIS

inquiries by the TPD between May 1 and November 17, 2016 with one exception.  The DCJIS

found that one query on Kelly Merrill performed by Dispatcher Considine on September 27,

2016 (the day Merrill's appointment was discussed during a public meeting of the BOS) was

conducted without an authorized purpose.  Id.; Doc. No. 157-44 at 3.  The next day, Eaton

forwarded the DCJIS report to Jenkins, who advised Eaton that the report must remain

confidential, and reiterated the request or direction that Eaton refrain from taking any action in

connection with the investigation.  Eaton Aff., Doc. No. 157-66 ¶ 99.

Eaton did not follow Jenkins' directions or requests. Instead, he "believed that [h]e needed to take action to protect the TPD and the public trust in the TPD" and "[a]t that point, it was clear to [him] that the CORI investigation being conducted by Attorney Jenkins was being used by Kreidler to retaliate against [him] and Sergeant Girard for raising the question of whether Kelly Merrill was an appropriate hire by Kreidler." Id. ¶ 100.

On February 10, 2017 at 2:40 p.m., Eaton sent a memorandum to the BOS making several demands. Doc. No 119-68 at 182:2-184:15. In it, Eaton told the BOS to issue a press release by 5:00 p.m. that same day "exonerating" him and the officers accused of conducting illegal background checks and "reinstat[ing] Sergeant Girard with "rank, time in grade and [compensation] for all time lost." Doc. No. 157-46 at 3. Eaton warned that "[f]ailure to do so will result in a public statement by me as the Chief of Police in the form of a written press release." Doc. No. 157-46 at 3. The Court notes that public meeting laws ordinarily require advanced public notice of meetings of the BOS; in other words, the BOS could not meet lawfully that day in response to Eaton's demand.[9] Nothing in Eaton's memorandum nor in the record before the Court establishes any time-sensitive urgency to Eaton's requests, let alone such urgency that his demands could not have been addressed in the ordinary course at the next scheduled BOS meeting. When the BOS did not respond by the 5:00 p.m. deadline unilaterally established by Eaton, Eaton issued the press release at 5:02 p.m. that day, approximately two hours and twenty minutes after Eaton sent the memorandum to the BOS. Eaton Aff., Doc. No. 157-66 ¶ 104; Doc. No 157-47. Eaton's press release largely mirrored his memorandum to the

---

[9] At the oral argument on the Summary Judgment Motions, Eaton's counsel suggested that the BOS could have convened an emergency meeting in the two-hour window prior to the 5:00 p.m. deadline. However, Eaton has identified no "emergency" that would necessitate such a meeting, nor has he identified any reason why his demands required urgent attention from the BOS.

BOS, including his assertion that the investigation by Jenkins was a "strategic assassination" of the TPD.  Doc. No. 157-47 at 3.

Later that evening, Smart, the Chair of the BOS, issued a letter to Eaton placing him on Administrative Leave with pay.  Eaton Aff., Doc. No. 157-66 ¶ 105; Doc. No 157-48.  The Town also issued its own press release explaining that Eaton was scheduled to sit for a recorded interview on February 15, 2017 with Town Counsel as part of the ongoing investigation.  Eaton Aff., Doc. No. 157-66 ¶ 106; Doc. No 157-49 at 2.

On February 13, 2017, Eaton was admitted to McLean hospital for, among other things, PTSD, which he attributes, in part, to stress from his job.  Eaton Aff., Doc. No. 157-66 ¶ 107. Eaton was discharged from McLean Hospital on March 1, 2017.  Doc. No. 157-52.  A discharge note dated March 1, 2017 from McLean Hospital, explains that Eaton had been discharged from the Hospital's inpatient program, will continue outpatient programming with Dr. Michael Burkart, and should "avoid any work-related responsibilities until he has achieved a period of greater stabilization of his symptoms."  Doc. No. 157-52 at 3.  A second note from McLean dated March 7 states that Eaton completed a PTSD skills-based group offered by McLean and says nothing at all either way regarding Eaton's work-related responsibilities.  Id. at 4.  On March 16, 2017, Dr. Burkart wrote a short, handwritten note.  Id. at 2.  It states: "[i]t is my recommendation that [Eaton] not testify or answer question at any hearing until he completes his current treatment which should be in both conjunction with me and McLean Hospital in approximately 10 weeks from today."  Id.  Neither during the relevant events nor later did Eaton provide any further information regarding his medical condition, when he was, or would be, sufficiently "stabilized" to resume his duties as Chief of Police, or the reasonable

accommodations, if any, needed for Eaton to perform the essential functions of his job as Chief of Police.

On February 14, 2017, Fred Ryan, the Executive Coach hired by the BOS, issued his report.  Doc. No. 119-96.  The report outlines Ryan's findings and observes that Eaton was "irrationally fixated" on Jenkins' investigation.  Id. at 4.  Ryan also stated his opinion that Eaton's press release was "inflammatory and completely unprofessional."  Id.   The report concludes with the following "recommendation":

> Given that the chief has decided to take a 'scorched earth' approach to these working relationships, combined with the fact that he has indicated that he does not believe that my coaching would help him overcome his mistrust of the BOS, there is nothing further that I can do in this situation.

Id. at 5.

On March 28, 2017, Eaton and his attorney attended the interview with Jenkins related to the ongoing CJIS investigation, which had been postponed from the original February date.  Eaton Aff., Doc. No. 157-66 ¶ 108.  At the start of the interview, Eaton presented Jenkins with the three doctors' notes discussed above.  Upon reviewing the notes, Jenkins immediately suspended the interview.  Id.; Doc. No. 157-51.

The BOS met in an executive session on April 6 during which Jenkins presented the factual findings of his investigation.  Doc. No. 157-58 at 2-5.  The notes from the meeting state that Eaton was given 48 hours' notice of the session as required by his contract, but neither he nor his counsel attended.  Id. at 2.  Jenkins' findings detailed certain basic facts about the course of his investigation including, inter alia, the following:

- "On October 16, 2016, Chief Eaton provided Ms. Smart with confidential BOP information."  Id.
- "On January 24, 2017, Town Counsel sent an e-mail to Chief Eaton asking him to confirm a statement made by Officer Rochette that the Chief advised Officer Rochette

that [the Chief] was preparing a report vindicating all department officers in the BOP investigation." Id. at 3.

- "On January 30, 2017, Chief Eaton confirmed that Officer Rochette's testimony was accurate." Id.
- "On February 9, 2017, Town Counsel sent an e-mail to Chief Eaton with a copy to Attorney Austin Joyce. The e-mail instructed Chief Eaton that the investigation and the DCJIS report remained confidential." Id. at 4.
- "On February 10, 2017, Chief Eaton sent a memorandum to the Board of Selectmen and the Town Administrator . . . . Chief Eaton informed the Board that the DCJIS investigation 'unequivocally exonerates all 3 police officers' in connection with the BOP investigation.' The statement made by Chief Eaton was false." Id.
- "Chief Eaton advised the Board that[,] unless the demands set forth in the memorandum were not [sic] implemented within two (2) hours[,] he would issue a written press release." Id.
- "On February 10, 2017, Chief Eaton issued a press release which falsely informed the public as to the status of the DCJIS investigations." Id.

BOS voted to "accept" Jenkins' findings and to issue a notice of disciplinary hearing letter to Eaton. Id. at 5. The hearing was scheduled for April 21, 2017. Id.

In her deposition, Smart stated that she had determined that Jenkins' findings of fact were true prior to the April 21 disciplinary hearing. Doc. No. 163-2 at 85 ¶ 85; Doc. No. 119-72 at 159:3-7. King emailed Kreidler prior to the disciplinary hearing and stated: "I also want to express a strong desire to expedite an ending to the issues with him. I have no interest in creating additional legal headaches just because they are available. The money is not the only issue. I want to end this nightmare sooner than later." Doc. No. 163-1 at 78-79 ¶ 75.

Eaton received the Notice of Disciplinary Hearing Opportunity by email on the evening of April 6, 2017 and was served with the Notice by a constable on April 7, 2017. Eaton Aff., Doc. No. 157-66 ¶ 109; Doc. No. 157-53; Doc. No. 119-108 at 31. The Notice is dated April 6 and states, under the date line, "by email, certified mail, first class mail, and constable." Doc. No. 157-53 at 2. Under Eaton's contract, he was entitled to ten business days' notice of a disciplinary hearing. Eaton Aff., Doc. No. 157-66 ¶ 109. There were ten business days between

the time Eaton received the Notice by email (on evening of April 6)[10] and the date of the hearing, and nine business days between the date on which the Notice was served (April 7) and the date of the hearing.

The Notice, which was signed by Kreidler, set forth the grounds for discipline, but did not attach the proposed findings of fact.  Doc. No. 157-53 at 2-5.  In a letter signed by Eaton himself (not his then counsel) and dated April 14, 2017, Eaton contended that the Notice was not compliant with the terms of his contract because it did not include the dates and times of all of the alleged offenses, and asked for a continuance due to his attorney's preparations for a federal trial scheduled for May 1, 2017.  Doc. No. 157-54.  Neither in this letter nor at any other time during the relevant events did Eaton complain that he did not receive the ten business days' notice to which he was entitled under his contract.  In a letter dated April 18, 2017, Eaton's request for a continuance was denied.  The letter, which is signed by Kreidler, notes that Eaton's attorney did not request the continuance directly and that Eaton failed "to articulate[] the reason why a hearing scheduled on April 21, 2017 would interfere with a trial beginning two weeks later."  Doc. No. 157-55 at 2.  Neither in his April 14 continuance request nor at any other time prior to the hearing did Eaton request a delay due to his PTSD or any other mental health concern.

_____

[10] There is no doubt that Eaton received the Notice by email on April 6.  Eaton's interrogatory response states: "[o]n April 6, 2017, Defendant Kreidler sent me notice that the BOS would conduct a disciplinary hearing relative to Plaintiff Eaton's employment."  Doc. No. 119-108 at 31.  Even if Eaton received the Notice on the evening of April 6, there were ten business days between then and the April 21 hearing contrary to the assertions of his attorney.  Those ten business days are: April 7, 10, 11, 12, 13, 14, 17, 18, 19, and 20.  Even if Patriots' Day, which fell on April 17 (and is a state but not a federal holiday), is excluded from this calculation, this is of no assistance to Eaton due to: 1) the reasons described in the text; 2) Eaton's failure to complain at the time that Patriots' Day could not count as one of the ten days; and 3) the fact that any breach by the Town was not material as explained infra at 27 n.15.

On April 17, 2017, Eaton submitted an affidavit to the BOS for an unrelated disciplinary hearing for TPD Lieutenant Giancotti.  Doc. No. 119-112 at 2-3.  In it, Eaton presents facts favorable to Giancotti's position.  Id.

Eaton appeared for his disciplinary hearing with his lawyer on April 21, 2017.  Doc. No. 157-57 at 2.  At the beginning of the hearing, Eaton's attorney requested an open session as was his right.  Id.  As a result, the meeting was temporarily suspended and moved to a different room large enough to accommodate the members of the public interested in attending.  After the hearing resumed, Eaton's attorney produced the three letters from Eaton's doctors, including the handwritten note from his psychologist recommending that Eaton refrain from testifying or answering questions for ten weeks from March 16.  Id.; Doc. No. 157-52 at 2.  Eaton's lawyer then requested to continue the hearing until May 26 as a reasonable accommodation for Eaton's PTSD.[11]  Doc. No. 157-57 at 2.  Jenkins pointed out that the request was waived because the doctors' notes did not mention that Eaton was impaired and lacked sufficient information regarding Eaton's PTSD diagnosis.  Id.  Over protests by Eaton's counsel that the contract did not require medical issues to be raised in advance, the BOS voted to deny Eaton's continuance request.  Id. at 2-3.

Jenkins proceeded with his presentation, explaining that his proposed findings of fact did not bind the BOS and were simply guidance.  Id. at 3.  The dispute, according to Jenkins'

---

[11] The parties dispute whether Eaton requested a ten-week continuance from the date of the hearing or a continuance until May 26, which is ten-weeks from when Eaton's doctor wrote the letter.  Compare Doc. No. 119-59 at 15 ("Eaton's attorney, without any advance notice, requested that the hearing be continued for (10) weeks.") with Doc. No. 154-1 at 18 ("Eaton did not ask for a ten-week continuance of his termination hearing; he requested an extension to May 26, 2017."). The Court construes the evidence in Eaton's favor and finds that he requested a postponement until May 26, which amounts to a six-week continuance from the date of the hearing.

presentation, was "whether [Eaton] was within his rights to ignore the Board's instruction

(related to the CJIS/CORI/BOP matter) and distribute information." Id. The record on which

Jenkins relied included numerous exhibits that he had previously provided to Eaton's attorney.

See Doc. No. 119-111.

After a brief recess, Eaton's lawyer began his presentation by explaining that Eaton was

incapable of defending himself in light of his doctor's orders. Doc. No. 157-57 at 3. Jenkins

suggested that Eaton submit an affidavit similar to the one he produced for Giancotti's

disciplinary hearing or make a verbal statement without being subject to cross-examination. Id.

at 3-4. Eaton's counsel asked how long Eaton could have to draft the affidavit.[12] Id. at 4.

According to the meeting minutes, Jenkins responded that Eaton must produce the statement

"today" to "keep the case moving," and that the BOS would provide a space for Eaton to write

his statement. Id. Eaton's affidavit states that Jenkins gave him only ten minutes to write the

statement. Eaton Aff,, Doc. No. 157-66 ¶ 117. Eaton's counsel declined Jenkins' offers. Doc.

No. 157-57 at 4. According to the meeting minutes, Eaton's counsel made no further arguments

on Eaton's behalf. Id. Nothing in the summary judgment record, including Eaton's affidavit,

suggests that Eaton's counsel made any substantive argument at the hearing.[13]

Eaton points out that King was using her computer throughout the hearing. Eaton Aff.,

Doc. No. 157-66 ¶ 116. In response to criticism from other social media users about this

conduct, King posted: "Never said I was distracted  . . . . It's not bad management to see how the

press is viewing the meeting" and "Don't worry-I didn't miss a thing…I had already heard and

---

[12] According to Eaton's affidavit, his counsel requested three weeks to produce a written statement. Eaton Aff., Doc. No. 157-66 ¶ 117.
[13] Though Eaton's termination letter states that Eaton introduced some exhibits during the hearing, there is no evidence that Eaton's counsel made substantive arguments on his behalf. Doc. No. 157-61 at 5.

seen every bit of the information before the meeting-more than I care to have ever known[.] Doc. No. 163-2 at 84 ¶ 82; Doc. No. 119-92 at 189:17-192:15.  Eaton also contends that Smart had her head on the desk for periods of time during the hearing.  Doc. No. 163-2 at 84 ¶ 82.

By unanimous vote and without further discussion, the BOS adopted the findings of fact and exhibits, found that the findings of fact established that Eaton violated his employment contract as well as the rules and regulations of the police department, and determined that there was just cause to terminate Eaton's employment effective immediately.  Doc. No. 157-57 at 4-5.

The BOS finalized a contract with Eaton's replacement on April 25, 2017, four days after the removal hearing.  Doc. No. 157-59.  According to the Town Charter, all vacancies must be posted for at least fourteen days before a candidate's appointment.  Doc. No. 119-66 at 21-22.

A letter dated May 4, 2017 notified Eaton in writing of his termination pursuant to the vote of the BOS. Doc. No. 157-61.[14]

## II.    LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to [] view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

---

[14] The Plaintiff submits two termination letters, one dated May 1 and signed by Kreidler, Doc. No. 157-60, and a "revised" letter dated May 4 and signed by Clark, Doc. No. 157-61.  The Court here refers to the May 4 letter.

party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation."

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).

III.   COUNT I: BREACH OF CONTRACT

Count I is a breach of contract claim against the Town of Townsend.  Doc. No. 22 at ¶¶

85-88.  "To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was

an agreement between the parties; the agreement was supported by consideration; the plaintiff

was ready, willing, and able to perform his or her part of the contract; the defendant committed a

breach of the contract; and the plaintiff suffered harm as a result."  Bulwer v. Mount Auburn

Hosp., 46 N.E.3d 24, 39 (Mass. 2016).  Just cause for removal is an affirmative defense to a

breach of contract claim.  Goldhor v. Hampshire Coll., 521 N.E.2d 1381, 1385 (Mass. App. Ct.

1988).  Thus, Townsend must shoulder the burden of proof to the extent that it relies on just

cause.

To determine the existence of just cause, courts consider whether:

there existed (1) a reasonable basis for employer dissatisfaction with a new
employee, entertained in good faith, for reasons such as lack of capacity or
diligence, failure to conform to usual standards of conduct, or other culpable or
inappropriate behavior, or (2) grounds for discharge reasonably related, in the
employer's honest judgment, to the needs of his business. Discharge for a 'just
cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily,
capriciously, or in bad faith.

Joyal v. Hasbro, Inc., 380 F.3d 14, 21 (1st Cir. 2004) (quoting G & M Employment Serv., Inc. v.
Commonwealth, 265 N.E.2d 476, 480 (Mass. 1970)).

Eaton's breach of contract claim cannot withstand summary judgment for two reasons.
The undisputed facts establish just cause for Eaton's termination as a matter of law.  Eaton sent
the BOS a memorandum on February 10, 2017 demanding it take certain action by close of
business that day.  Not only was the memorandum itself deemed "completely unprofessional" by
the report of executive coach Fred Ryan, Doc. No. 119-86 at 4, it demanded that the BOS take
action that day it could not lawfully take, see supra at 17.  In addition, the memorandum
contained plainly false statements.  Specifically, the memorandum stated that "[Eaton] [has] fully
complied with all requests from David Jenkins."  Doc. No. 157-46 at 2.  The undisputed
evidence establishes that this statement was false.  Jenkins had, inter alia, requested that Eaton
(1) cease his personal investigation into the CJIS matter, (2) keep the DCJIS report confidential,
and (3) take no action with respect to the CJIS investigation.  Doc. No. 157-42, Eaton Aff., Doc.
No. 157-66 ¶ 99.  Yet, Eaton did each of these things.  Whether or not Jenkins possessed the
legal authority to require Eaton's compliance with these requests, Eaton's statement that he had
"complied with all" requests of Town Counsel was simply untrue.  Of course, the press release
repeated the statements in the letter.  Almost immediately after Eaton's press release, Smart, as
the Chair of the BOS, placed Eaton on administrative leave, relieving him of all duties and
authority as Chief.  Doc. No. 157-48.  All of these facts are undisputed.  Plainly, the BOS
viewed Eaton's actions as serious and termination worthy.  The BOS duly found these facts to be
true at the disciplinary hearing and determined, properly, that they violated various provisions of
the TPD's policies and procedures and Eaton's employment contract, including, inter alia: TPD
policies governing professional conduct and responsibilities, the dissemination of official

information, and truthfulness.  See Doc. No. 157-61 at 5-7.  The foregoing undisputed evidence

satisfies the Town's burden to establish just cause under the contract.  The Town's Motion for

Summary Judgment on Count I is ALLOWED for this reason alone.[15]

Two further points bear mention.  First, Eaton bears the burden to establish that he was

"ready, willing, and able to perform his . . . part of the contract."  Bulwer v. Mount Auburn

Hosp., 46 N.E.3d at 39.  This he has not done for the reasons giving rise to just cause for

termination.  Second, Eaton's contract states that he can challenge the removal decision with an

"appeal . . . to the Superior Court."  Doc. No. 157-7 at 5.  By using the word "appeal," which is

ordinarily understood to mean record review, this language may well be reasonably read to limit

any breach of contract claim arising from a termination to the record created before the BOS at

the disciplinary hearing.  The parties did not meaningfully address this question and, given the

Court's conclusion on the issue of just cause, it does not resolve it.

Townsend's Motion for Summary Judgment is therefore ALLOWED as to Count I.

IV.    COUNT II: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

In Count II, Eaton brings a claim for breach of the covenant of good faith and fair dealing

against Townsend.  Doc. No. 22 ¶¶ 89-92.  Relying on arguments similar to those stated above

with respect to the breach of contract claim, the Town contends that its decision to remove Eaton

---

[15] Breach of contract arising from termination is the only theory of breach advanced by Eaton.
He does reference other contract issues, including: 1) that he received less than ten days' notice
of the disciplinary hearing; and 2) the disciplinary hearing notice failed to provide the dates of
each event giving rise to discipline.  When the Notice is read in light of the events that had
recently transpired and of which Eaton possessed personal knowledge, it provided Eaton with
sufficiently detailed notice to comply with the contract and to allow him to prepare a defense.
As for the ten days, Eaton failed to complain at the time that the Notice breached the contract.
For this reason, as well as Eaton's failure to show how he was prejudiced by the Town's failure
to accord him several more days, he cannot show a material breach of this provision in this case
on this record.

was justified.  Doc. No. 119-59 at 18-19.  Eaton offers a slew of facts in support of his claim,

which the Court summarizes below:

- "Clark and Kreidler repeatedly sought to interfere with the day to day operations of the police department and created a hostile work environment that interfered with Eaton's job performance."  Doc. No. 154-1 at 11
- The BOS did not give Eaton a performance review as required by his employment contract.  Id.
- The BOS did not vote to approve Eaton's $5,000 bonus and allegedly "lied . . . that they had been advised by Town Counsel that they could not discuss his employment or bonus."  Id.
- The BOS published what Eaton terms "false and defamatory" press releases about Eaton and the TPD.  Id.
- The BOS took certain disciplinary actions against other members of the TPD.  Id.
- The BOS failed to continue Eaton's disciplinary hearing.  Id.
- The BOS removed Eaton prior to the expiration of his employment contract.  Id.

The covenant of good faith and fair dealing is implied in every Massachusetts contract.

Robert & Ardis James Found. v. Meyers, 48 N.E.3d 442, 449-50 (Mass. 2016).  Its purpose is to

ensure "that neither party shall do anything that will have the effect of destroying or injuring the

right of the other party to receive the fruits of the contract."  Id. at 450 (quoting Anthony's Pier

Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 806 (Mass. 1991).  The Plaintiff bears burden of

proving a lack of good faith, which the Court may infer based on the totality of the

circumstances.  Id.

Though "there is no requirement that bad faith be shown," T.W. Nickerson, Inc. v. Fleet

Nat. Bank, 924 N.E.2d 696, 704 (Mass. 2010), neither is there a "general duty on the part of an

employer to act 'nicely.'"  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass.

2005).  Moreover, the covenant "may not be 'invoked to create rights and duties not otherwise

provided for in the existing contractual relationship,' but rather concerns the manner of

performance."  Id. (quoting Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d

28

957, 964 (Mass. 2004)). Accordingly, "the scope of the covenant is only as broad as the contract that governs the particular relationship." Id.

Eaton has failed to meet his burden. Eaton's numerous claims amount to nothing more than an allegation that the Town treated him unfairly. "To the extent that [Eaton's] claim rests on allegations that [Townsend] dealt with [him] in a manner that was unfair[,] . . . [he] did not present a claim on which [he] [can] recover." See id. at 683-84 (finding no violation of the covenant when the plaintiff's employer, a hospital accused of medical malpractice, attempted to deflect blame by scapegoating the plaintiff). That ends the matter as to this claim. Nonetheless, the Court proceeds to address certain of Eaton's specific arguments.

First, as to Eaton's contention that Clark and Kreidler interfered with the TPD and created a hostile work environment. Eaton's hostile work environment argument fails for the reasons explained infra at 38-40. Moreover, "hostile work environment" is a term of art reserved for claims of discrimination arising from a protected status under the law; a hostile work environment claim does not arise from general unsavory conduct in the workplace. As for the alleged interference by Clark and Kreidler, nothing in Eaton's contract promised him a conflict-free work environment or shielded him from interactions with the Town Administrator or individual members of the BOS. Assuming without deciding that Clark as an individual member of the BOS was bound by the Town Charter's provisions regarding the day-to-day operations of the TPD or that Kreidler's actions were really those of the BOS and either or both were in arguable violation of the Town Charter, these actions do give rise to a breach of the duty of good faith and fair dealing because they did not prevent Eaton from reaping the benefits of his contract. The undisputed evidence establishes the Eaton rejected Clark and Kreidler's suggestions.

Eaton's claim that the BOS violated the covenant when it declined to take up his bonus and performance review at the November 22 executive session is similarly unavailing. Eaton's contract did not guarantee him a bonus or a performance review on a specified date. See Doc. No. 157-7 at 2 (explaining that the Chief may receive a $5,000 bonus "subject to affirmative vote of the Board after a six month performance review") (emphasis added). The contract did not guarantee a review precisely at the six-month mark, and states only that such review would occur "after" six months. The contract entitled the BOS to delay the resolution of these issues for a reasonable period in light of the ongoing investigation.

Finally, Eaton contends that the BOS breached the covenant when it denied his request for a continuance of the removal hearing. The parties agreed to a ten-day notice period. As previously explained, Eaton received sufficient notice. See supra at 27 n.15. Moreover, Eaton did not complain at the time of the alleged breach of the notice entitlement. Eaton's argument regarding the Town's denial of Eaton's second request for a continuance at the removal hearing is no more persuasive. The Town's decision to deny a day-of request for a continuance simply does not constitute a breach of the covenant. None of the letters from the doctors described Eaton's condition in April, the progress, if any, he made during the first five of ten weeks of outpatient treatment, or the reason(s) he could not write an affidavit or make a statement without cross-examination in his case but could write an affidavit regarding another work matter. In these circumstances, the letters from the doctors fail to support a claim for breach of the covenant of good faith and fair dealing.

Accordingly, Townsend's Motion for Summary Judgment is ALLOWED on Count II.

V.      COUNTS III AND IV: DISABILITY DISCRIMINAITON

Next, Eaton brings federal and state claims against Townsend for disability

discrimination.  Eaton presents four theories in support of these claims: (1) failure to reasonably

accommodate his requests to report to Kreidler and to continue his removal hearing; (2) failure to

engage in an interactive process; (3) hostile work environment; and (4) disparate treatment.  See

Doc. No. 22 ¶¶ 93-106.  For the reasons that follow, Townsend's Motion for Summary Judgment

on Counts III and IV is ALLOWED.

A.      Reasonable Accommodation and Interactive Process

To withstand summary judgment on his disability discrimination claims, Eaton must

establish a genuine dispute of material fact as to the following three elements:[16] (1) "he is

disabled within the ADA's definition," (2) he "could perform the job's essential functions either

with or without a reasonable accommodation," and that (3) "the employer knew of [his]

disability, yet failed to reasonably accommodate it."  Audette v. Town of Plymouth, 858 F.3d 13,

20 (1st Cir. 2017) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016)).

Because the Defendant assumes for the purposes of summary judgment that Eaton is disabled

under the ADA due to his PTSD diagnosis, the Court follows suit.

The second element is subject to dispute and requires Eaton to show: (1) "that [he]

possesses the requisite skill, experience, education and other job-related requirements for the

position'; and (2) 'that [he] is able to perform the essential functions of the position with or

without reasonable accommodation.'"  Echevarria v. AstraZeneca Pharm. LP, 856 F.3d 119, 126

---

[16] The First Circuit has noted that "Massachusetts's handicap discrimination statute . . . is nearly
identical to the ADA" and so "we analyze the statute in exactly the same manner as the ADA."
Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017) (internal quotation marks
omitted).  Unless otherwise noted by the Court, neither party has argued that the Court should
analyze the discrimination claim separately under federal and state law.

(1st Cir. 2017) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006)).  Here, the first requirement is not at issue.  The Court therefore focuses its inquiry on the second requirement, which can itself be broken into component parts.  As to this requirement, Eaton "bears the burden of showing the existence of a reasonable accommodation" by demonstrating that (1) it would enable him "to perform the essential functions of the job" and (2) "on the face of things, it is feasible for the employer under the circumstances." Echevarria, 856 F.3d at 127 (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 260 (1st Cir. 2001)).  Only if Eaton satisfies his prima facie burden must Townsend "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." Eustace v. Springfield Pub. Sch., 463 F. Supp. 3d 87, 103 (D. Mass. 2020) (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)).

Even drawing all reasonable inferences in the Plaintiff's favor, Eaton fails to establish that the reasonable accommodation he proposed would have enabled him to perform the essential functions of the Chief of Police position.  As discussed above, the undisputed evidence establishes that Eaton failed to perform the essential functions of his job, which resulted in just cause for his termination.  For this reason alone, this claim fails.

Even assuming he could perform the essential functions of his job with the reasonable accommodation, the claim fails. Thus, the Court now trains its attention on the second facet of the reasonable accommodation inquiry: whether Eaton's requests were facially reasonable.  As explained below, they were not.

### 1.    *Eaton's Request to Report to BOS*

As the First Circuit has recognized, "the fact-intensive nature of the reasonable-accommodation inquiry does not insulate disability-discrimination cases from summary

judgment.  To the contrary, a plaintiff must show, even at the summary-judgment stage, that the requested accommodation is facially reasonable."  Echevarria, 856 F.3d at 128.  As part of his facial-reasonableness showing, Eaton must "take [] obvious burdens [associated with the reasonable accommodation] into account."  Id. at 131.

During a call with Smart on November 19, 2017, Eaton requested a reasonable accommodation to report to the BOS rather than Kreidler.  Eaton Aff., Doc. No. 157-66 ¶ 54.  In support of his request, Eaton explained that Kreidler's conduct was causing his PTSD symptoms to worsen.  Id.  Eaton provides little in the way of further detail or context, stating only that he made the request repeatedly and that it was denied each time.  Id. ¶ 55.

Eaton's request to report to Kreidler was unreasonable on its face.  For one, fulfilling such a request would necessitate a change in the Town's management practices.  Eaton does not meaningfully grapple with such burdens, nor does he propose an alternative accommodation that would accomplish his aims as well as those of the Town.  Instead, Eaton states that "[t]he amount of time that Eaton spent dealing with legitimate administrative issues with Kreidler was small and Eaton could have easily provided the information to the Chair of BOS."  Doc. No. 154-1 at 18.  This conclusory assessment is insufficient at the summary judgment phase.  Furthermore, courts that have confronted similar requests from employees seeking transfer away from co-workers or supervisors have found that such requests unreasonably interfere with the employer's right to establish the conditions of employment.  See, e.g., Gaul v. Lucent Techs., Inc., 134 F.3d 576, 579 (3d Cir. 1998) ("The primary issue before us is whether [plaintiff's] request to be transferred away from individuals causing him prolonged and inordinate stress was unreasonable as a matter of law under the ADA.  We conclude that it is."); Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996) ("[N]othing in the law leads us to

conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy."); Weiler v. Household Fin. Corp., 101 F.3d 519, 526 (7th Cir. 1996) ("[Plaintiff] asks us to allow her to establish the conditions of her employment, most notably, who will supervise her.  Nothing in the ADA allows this shift in responsibility."); Tuvell v. Int'l Bus. Machines, Inc., No. CIV.A. 13-11292-DJC, 2015 WL 4092614, at *9 (D. Mass. July 7, 2015), aff'd, 643 F. App'x 1 (1st Cir. 2016) ("[T]he ADA does not require [the employer] to transfer [the plaintiff] or assign him to another supervisor.").  On the record before the Court, Eaton has failed to provide evidence that would support a finding that his request was reasonable.

Under the third element of a disability discrimination claim, e.g., that "the employer knew of her disability,[17] yet failed to reasonably accommodate it," Audette, 858 F.3d at 20 (quoting Lang, 813 F.3d at 454), "an employee's request for accommodation sometimes creates a duty on the part of the employer to engage in an interactive process."  E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014) (internal quotation marks omitted).  The disability discrimination statutes envision a "cooperative" and "flexible" process that "involves both the employer and the qualified individual with a disability."  Rennie v. United Parcel Serv., 139 F. Supp. 2d 159, 168 (D. Mass. 2001) (citations omitted).  "[I]t is imperative that both the employer and the employee have a duty to engage in good faith."  Kohl's Dep't Stores, Inc., 774 F.3d at 132.  "If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to

---

[17] Townsend contends that Eaton did not clearly request an accommodation on the basis of his PTSD.  Doc. No. 119-59 at 21-22.  This argument fails.  The summary judgment record reveals that Eaton requested an accommodation due to his PTSD during his November 19 call with Smart.  Eaton Aff., Doc. No. 157-66 ¶ 54.

cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations."  Id.

As an initial matter, the Court need not examine Eaton's interactive process claim because his accommodation request was unreasonable.  See Echevarria, 856 F.3d at 133. ("Where, as here, the employee fails to satisfy her burden of showing that a reasonable accommodation existed, the employee cannot maintain a claim for failure to engage in an interactive process.").  Nevertheless, the Court will briefly address this claim as the record reveals that it fails on the merits.  The evidence establishes that Smart sent Eaton an email shortly after he requested the accommodation.  Smart stated:

> After I got off the phone, I starting [sic] thinking. I know we both vented about our feelings regarding the difficulties and challenges we are both facing, I just want to be absolutely sure that is what our conversation was about. The reason I say that, you did express how recent events may be affecting your health and you feel like you're working in a hostile environment with the demands of the community in regards to the town administrator. We both know those are key words managers have to pay attention to and I just wanted to be sure we were just sharing our thoughts and it was not a sign to me that I should be doing something else liking [sic] referring it to our EAP program or something like that. I want you to feel comfortable venting or expressing your frustration and trusting of me in that regard but I just want to be sure I am not doing the wrong thing by just keeping it between us.

Doc. No. 157-28.

Smart's email was a clear attempt to clarify whether Eaton was simply "venting" or requesting further action on behalf of BOS.  In contrast to situations where an employer "completely disregarded" an employee's requests for help, "extended no response at all to [employee's] requests, and failed to give any explanations for its failure to do so," Smart engaged and sought further information from Eaton.  See Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination, 808 N.E.2d 257, 269 (Mass. 2004).  Other than vague assertions that he requested the accommodation to report to the BOS "repeatedly," Eaton

has not produced any evidence suggesting that he responded to Smart's email or otherwise continued the conversation in good faith.  See Eaton Aff., Doc. No. 157-66 ¶ 55-54.  Without more evidence (and there is no more), Eaton cannot sustain his interactive process claim.

2.     *Eaton's Request for a Continuance*

Next, Eaton contends that Townsend improperly denied his request to continue the removal hearing due to his doctor's advice to avoid testimony until his PTSD symptoms stabilized.  For reasons similar to those explained above, this claim fails.

As an initial matter, Eaton bore the burden to request a reasonable accommodation so as not to have to testify at the hearing on April 21 due to his PTSD.  When he received the Notice of Disciplinary Hearing Opportunity on April 6, Eaton was aware of his disability and his treating psychologist's advice against "testifying" or "answering questions" until May 26.  The undisputed evidence reveals that there were options available to Eaton that would enable him to participate in the hearing.  Yet, Eaton failed to invoke such options.  On April 17, just days before his own disciplinary hearing, Eaton submitted an affidavit regarding the activities of the TPD in support of another officer charged with misconduct.  Doc. No. 157-57 at 4; Doc. No. 118-112.  Eaton made no request during the preparation period prior to the hearing to proceed using a similar affidavit.  This contractual period is presumptively sufficient to prepare such a submission.  Moreover, the medical notes Eaton submits do not suggest, let alone establish, that he could not have prepared such an affidavit.  There is no other evidence even arguably supporting such a conclusion, especially in light of the fact that he was able to submit such an affidavit days before his hearing.

In addition, Eaton could have requested a continuance prior to his hearing, i.e. during the ten-day notice period, based on his PTSD so that he could testify live.  He made no such request.

Rather, he waited until beginning of his removal hearing, at which point his then counsel requested to continue the matter by six weeks to May 26, 2016.  Doc. No. 157-57 at 2.  In support of his request, Eaton produced the medical letters discussed previously.  Eaton declined Jenkins' offer to produce an affidavit or testify without being subject to cross-examination, and the BOS voted to deny the last-minute request.  Id. at 2-4.

Finally, Eaton's request for a six-week continuance on the day of his hearing was unreasonable.  See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be "too little, too late.").  Given the options available to Eaton in the days leading up to the hearing, his request for a six-week continuance was unreasonable in scope and timing.  As Townsend explains, the prospect of delaying the removal hearing by six weeks when the Town had already been without a Chief for ten weeks was infeasible.  Doc. No. 119-59 at 23.

Though the Court need not reach this issue due to its finding that the continuance request was unreasonable, see Echevarria, 856 F.3d at 133, Eaton's interactive process claim also fails.  As explained previously, both the employee and the employer are obliged to engage in the interactive process in good faith.  On these facts, Eaton cannot satisfy his burden to establish his own good faith.  In addition, when Jenkins offered Eaton the opportunity to submit an affidavit or testify without being subject to cross-examination, Eaton declined both offers.  While Jenkins only offered "ten minutes" to write the affidavit, per Eaton, nothing prevented Eaton from then requesting more time.  He did not, other than a three-week continuance.  Eaton had the opportunity to present his side of the story.  He has not met his burden to show that the Defendant failed to genuinely engage in an interactive process.

For the reasons explained above, Townsend's Motion for Summary Judgment on Eaton's reasonable accommodation claim is ALLOWED.

B.    Hostile Work Environment

To withstand summary judgment on his hostile work environment claim, Eaton must show: "(1) []he was disabled[18] . . . (2) []he was subjected to uninvited harassment, (3) [his] employer's conduct was based on [his] disability, (4) the conduct was so severe or pervasive that it altered the conditions of [his] work and created an abusive work environment, and (5) the harassment was objectively and subjectively offensive."  McDonough v. Donahoe, 673 F.3d 41, 46 (1st Cir. 2012).  A mere "offensive utterance," Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993), is not enough; the employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Andujar v. Nortel Networks, Inc., 400 F.Supp.2d 306, 329 (D. Mass. 2005) (quoting Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir.2005)).  In other words, the "workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins."  Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000).

Eaton's hostile work environment claim is premised on the following allegations:

- "Starting on May 5, 2016, just five (5) days after Eaton started work, Kreidler [and Clark] started harassing, bullying and manipulating Eaton."  Doc. No. 154-1 at 21.
- "Shortly after the November 19, 2016 call between Eaton and Smart, during which Eaton requested the reasonable accommodation, Kreidler's harassment towards him noticeably intensified."  Id. at 22.
- "During a January 18, 2017 meeting, Kreidler referred to Eaton as being insane and stated that he had concerns regarding Eaton's emotional stability."  Doc. No. 163-2 at 77-78 ¶ 63.
- Three days after Eaton requested a reasonable accommodation to report to the BOS, the BOS declined to take up his performance review and bonus during an executive session

_____

[18] As stated above, the Defendant does not dispute that Eaton is disabled.

and issued the allegedly defamatory press release concerning his resignation.  Doc. No. 154-1 at 22.

There are two fatal flaws in Eaton's hostile work environment claim.  "An employee claiming harassment must demonstrate that the <u>hostile conduct was directed at him because of a characteristic protected by a federal anti-discrimination statute</u>."  <u>Quiles-Quiles v. Henderson</u>, 439 F.3d 1, 7-8 (1st Cir. 2006) (emphasis added).  Eaton claims that Kreidler required him to attend frequent meetings during which Kreidler would condemn various members of the TPD. Doc. No. 154-1 at 21-22.  That Eaton suffered from PTSD and was also subject to allegedly unfair treatment by Kreidler is not enough to sustain his hostile work environment claim; Eaton must establish an affirmative link between Kreidler's hostility and Eaton's disability.  He has not done so.  <u>See</u> <u>Colon-Fontanez v. Municipality of San Juan</u>, 660 F.3d 17, 44 (1st Cir. 2011) (quoting <u>Lee–Crespo v. Schering–Plough Del Caribe, Inc.</u>, 354 F.3d 34, 46-47 (1st Cir.2003)) ("Furthermore, although [the supervisor's] interactions with [the plaintiff] may be described as brusque and even uncivil, we note that 'a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws.'"). Eaton's allegations regarding BOS's press release and decision to delay Eaton's performance review fail for the same reason.  Eaton has failed to establish that the BOS took these actions because of his disability.

In addition, Eaton has not established that the allegedly hostile conduct was severe and pervasive.  Eaton points to two statements by Kreidler that he construes as derogatory references to his PTSD diagnosis.  During the January 18 meeting, Kreidler called Eaton "insane" and expressed concerns about Eaton's emotional stability.  Doc. No. 163-2 at 77-78 ¶ 63.  Two isolated comments by Kreidler do not constitute objectively hostile or abusive conduct.  "While these facts certainly indicate an uncomfortable and tense working relationship between [Eaton]

and [Kreidler], again, they are not sufficiently severe or pervasive to constitute a hostile work environment." Colon-Fontanez, 660 F.3d at 44.

Accordingly, Townsend's Motion for Summary Judgment on Eaton's Hostile Work Environment claim is ALLOWED.

      C.      Termination Based on Disability

Eaton's final theory of discrimination is that he was terminated due to his disability.  The Court applies the familiar McDonnell Douglas burden-shifting framework.  To mount a prima facie case of disability discrimination, Eaton must show that: "(1) he suffers from a disability; (2) he was nevertheless able to perform the essential functions of his job, with or without reasonable accommodation; and (3) his employer took an adverse employment action against him because of his disability." Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010).  If Eaton can establish a prima facie case, "the burden then shifts to [Townsend] to articulate a legitimate, nondiscriminatory reason for [its] employment decision and to produce credible evidence to show that the reason advanced was the real reason." Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 154 (1st Cir. 2009) (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir.2005)).  If Townsend offers "such a legitimate reason, the burden shifts back to [Eaton] to produce evidence to establish that [Townsend's] nondiscriminatory justification is mere pretext, cloaking discriminatory animus." Id.

The Defendant contends that Eaton's discrimination claim fails because: 1) "there is no evidence to demonstrate that the decision to terminate Eaton . . . was based in any respect upon his PTSD diagnosis"; and 2) Townsend's decision to terminate Eaton was based on a legitimate and non-discriminatory reason, namely Eaton's poor leadership.  Doc. No. 119-59 at 26-27.  The

Court therefore treats the other elements of the <u>McDonnell Douglas</u> standard as undisputed for the purposes of this Motion.

Eaton cannot establish a prima facie case because he has offered no evidence to suggest that he was terminated, in whole or in part, because of his disability. Eaton concedes as much in his opposition brief, which is devoid of any evidence suggesting that Eaton was terminated due to his disability. <u>See</u> Doc. No. 154-1 at 23-26. Even if Eaton could successfully mount a prima facie case of disability discrimination, Townsend has proffered a legitimate non-discriminatory reason for Eaton's termination, <u>i.e.</u>, his repeated insubordinate conduct.[19] Moreover, Eaton has offered no evidence of pretext,[20] which requires "specific, admissible evidence [that] 'show[s] that the adverse employment action was [actually] the result of discriminatory animus." <u>Tuvell v. Int'l Bus. Machines, Inc.</u>, 2015 WL 4092614, at *11 (third alteration in original) (quoting <u>Che v. Mass. Bay Transp. Auth.</u>, 342 F.3d 31, 39 (1st Cir.2003)). Significantly, Eaton does not dispute that he issued the ultimatum letter to the BOS or the ensuing press release, which are two

---

[19] The Court notes that Townsend need not articulate a legitimate non-discriminatory reason for the termination in light of the Court's finding that Eaton has not established a prima facie case. <u>Tuvell v. Int'l Bus. Machines, Inc.</u>, 2015 WL 4092614, at *11.

[20] Eaton takes issue with the accuracy of the findings of fact that supported the BOS's termination decision. Citing <u>Joyal v. Hasbro, Inc.</u>, 380 F.3d 14 (1st Cir. 2004), Eaton contends that "under Massachusetts law, a plaintiff may be able to get his case to a jury, regardless of the circumstances, if he can present evidence sufficient to support a finding that at least one of the reasons given by the defendant for his termination was false." Doc. No. 154-1 at 25. Eaton's argument on this point is unavailing. For one, <u>Joyal</u> expresses skepticism of the notion that Massachusetts law allows a plaintiff to reach a jury simply by proving that one of the defendant's reasons for the termination was pretextual. <u>See Joyal</u>, 380 F.3d at 17 ("If <u>Lipchitz</u> does authorize the jury to decide for the plaintiff merely because the employer lied in one respect and regardless of circumstances, this may seem an oddly mechanical rule; one can imagine easily a case where an unimpeached and powerful nondiscriminatory reason is proved but the jury finds "pretextual" a further reason also given by the employer as a make-weight."). Even assuming that this interpretation is accurate, Eaton mischaracterizes the law; to get to the jury, he must show that one of Townsend's reasons for termination was "<u>deliberately</u> false," not simply factually inaccurate. <u>Id.</u> (emphasis added). He has not done so.

of the legitimate non-discriminatory reasons that Townsend offers in support of Eaton's termination.  Thus, Eaton's pretext arguments do not sufficiently rebut Townsend's legitimate, non-discriminatory reasons.

For the reasons stated herein, the Defendant's Motion for Summary Judgment on Eaton's disability discrimination claim is ALLOWED.

VI.   <u>COUNTS V AND VI: RETALIATION</u>

The Court need not dwell extensively on Eaton's state and federal retaliation claims against Townsend.  <u>See</u> Doc. No. 22 ¶¶ 107-113.  To prove retaliation, Eaton must show the basic elements that 1) he engaged in protected conduct; 2) he suffered an adverse employment action; and 3) the adverse employment action was causally linked to the protected conduct.  <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 28 (1st Cir. 2017).[21]  If Eaton establishes a prima facie case of retaliation, the burden shifts to Townsend to show a legitimate non-discriminatory reason for the adverse employment action, at which point the burden shifts back once again to Eaton to show that the proffered reason is pretextual.  <u>Jones v. Walgreen Co.</u>, 679 F.3d 9, 20 (1st Cir. 2012).

The Plaintiff is correct that his retaliation claims "may succeed even where [his] discrimination claim[s] fail[]."  <u>Valle-Arce v. P.R. Ports Auth.</u>, 651 F. 3d 190, 198 (1st Cir. 2011).  However, for the reasons explained above, Eaton does not sufficiently rebut Townsend's legitimate non-discriminatory reason for his termination, nor does he establish pretext.[22]  His

---

[21] The Defendant does not dispute that Eaton was engaged in protective conduct when he requested an accommodation to report to the BOS or that he suffered an adverse employment action.

[22] Insofar as Eaton suggests that the BOS's failure to take up his performance review and bonus constituted a retaliatory adverse action, these arguments fail for the reasons explained <u>supra</u> at 30.

retaliation claims therefore fail for lack of causation.  To the extent that Eaton relies on Townsend's alleged creation of a hostile work environment as an adverse employment action supporting his retaliation claim, Doc. No. 154-1 at 26-27, this argument is also unavailing.  As previously explained in detail, Eaton cannot sustain his hostile work environment claim.

Townsend's Motion for Summary Judgment on Count V and VI is therefore ALLOWED.

## VII.   COUNT VII: SECTION 1983 CLAIM

In Count VII, Eaton brings a 42 U.S.C. § 1983 claim against Townsend, Kreidler, Clark, Smart, and King alleging violations of his First, Fifth, and Fourteenth Amendment Rights.  Doc. No. 22 ¶¶ 114-120; Eaton v. King, Civil No. 20-40094-LTS, Doc No. 1-1 at 11-12.  Before delving into the substance of Eaton's claim, some procedural history bears mention.

In its Order on the Defendants' Motion to Dismiss, the Court dismissed Kreidler from this claim.  Doc. No. 44 at 14-15.  Thus, the only remaining defendants are Townsend, Clark, Smart, and King.  The Court's Order also dismissed the portion of Count VII asserting a violation of Eaton's First Amendment rights.  Id. at 12.   Because the Order was issued prior to the consolidation of this case with Eaton's related lawsuit against King and Smart, the First Amendment claim against Smart and King remains.  However, the Defendants contend, and the Plaintiff does not dispute, that the Order on the Motion to Dismiss applies with equal force to Eaton's First Amendment claim against Smart and King.  Accordingly, the Court ALLOWS King and Smart's Motion for Summary Judgment on Count VII insofar as it seeks judgment on Eaton's First Amendment claim for the reasons stated in its Order on the Defendants' Motion to Dismiss.  Doc. No. 44.  Finally, the Court's Order on the Motion to Dismiss clarified that "Eaton has alleged only one theory under his due process claims: that the hearing was a sham and thus

violated his right to due process." Doc. No. 44 at 14 n.4. The Court thus proceeds with its analysis, focusing its attention solely on the narrowed sham hearing claim before it.

> A.     Procedural Due Process

"[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." Gilbert v. Homar, 520 U.S. 924, 928–29 (1997). Here, the parties agree that Eaton had a property interest in his employment; the only dispute is whether he was provided with due process before he was terminated.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "The precise contours of this guarantee vary depending on the circumstances." Jones v. City of Bos., 752 F.3d 38, 56 (1st Cir. 2014). The First Circuit has held that "public employees are ordinarily entitled to notice of the reasons for a proposed termination, an explanation of the evidence supporting those reasons, and an opportunity to give their side of the story at a pre-termination hearing." Id. at 56-57. "A preterminaiton hearing should provide 'a meaningful opportunity to invoke the discretion of the decisionmaker,' both as to the facts supporting the termination and as to its broader appropriateness." Id. at 57 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985)). In other words, the employee is entitled to present his side of the story before a decisionmaker open to hearing and considering the employee's presentation.

In support of his sham hearing claim, Eaton presents the following facts:

- The BOS voted to postpone its consideration of Eaton's bonus during the November 22 executive session.[23]  Doc. No. 157-30 at 2-3.
- Eaton did not get a full ten-days'-notice of the hearing.  Eaton Aff., Doc. No. 157-66 ¶ 109
- The BOS reviewed and voted on the findings of fact before the hearing.  Doc. No. 157-58 at 2-5.
- The BOS refused to grant both of Eaton's requests to continue the hearing to a later date.  Doc. No. 157-54; Doc. No. 157-57 at 2.
- The BOS adopted the findings of fact at the hearing without questions or debate.  Doc. No. 157-57 at 4-5.
- King looked at her computer during the hearing.  Doc. No. 163-2 at 84 ¶ 82.
- King had previously emailed Kreidler saying: "I also want to express a strong desire to expedite an ending to the issues with him.  I have no interest in creating additional legal headaches just because they are available. The money is not the only issue. I want to end this nightmare sooner than later."  Doc. No. 163-1 at 78-79 ¶ 75.
- Smart had her head on the table during the hearing and had determined that the findings of fact were true prior to the hearing.  Doc. No. 163-2 84-85 ¶ 83-85.
- Eaton claims that Smart should have recused herself from the hearing for two reasons.  First, she was allegedly biased against Eaton.  Specifically, Smart made various accusations against Eaton in the past based on the TPD's alleged association with the recall movement.  See Doc. No. 163-2 at 55 ¶ 25.  Second, Smart served as both a decisionmaker in the hearing and a "percipient witness" given that Eaton's discussion of the CORI materials with Smart instigated the investigation.
- Eaton asserts that Clark was biased due to his wife's prior experience at the TPD and Eaton's unwillingness to comply with Clark and Kreider's requests to take disciplinary actions against various TPD officials.  Prior to the hearing, Patricia Clark's lawyer sent Eaton a cease-and-desist letter warning Eaton that "the Clarks have instructed me to pursue all available avenues for vindicating her."  Doc. No 163-2 at 77 ¶ 65; Doc. No. 157-41 at 2-3.
- Eaton claims that some of the BOS's findings of fact supporting the termination were incorrect.  Doc. No. 151-1 at 14.[24]
- The Chief position was filled four days after the hearing.  Doc. No. 157-59.  According to the Town Charter, all vacancies must be posted for at least 14 days before a candidate's appointment.  Doc. No. 119-66 at 21-22.

The Court addresses each of Eaton's arguments in turn.

---

[23] The Court need not address this argument, which has been considered and rejected previously.  See supra at 30.

[24] That some of the findings of fact are contested does not support a sham hearing claim.  Moreover, as previously explained, Eaton does not dispute two major reasons for his termination: the ultimatum letter and press release.  Because the Court has already opined on this issue previously, it does not repeat itself here.

The Court turns first to Eaton's argument regarding the sufficiency of the notice of the hearing. Eaton received contractually adequate notice. Even if it was slightly short as he contends, "a termination hearing is not a court of law, and the same level of process is not required." Chmielinski v. Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008); cf. Torres–Rosado v. Rotger–Sabat, 335 F.3d 1, 10 (1st Cir.2003) ("An agency's failure to follow its own rules may be significant in administrative law, but the federal Due Process Clause does not incorporate the particular procedural structures enacted by state or local governments; these claims should be pursued, if at all, under [state] law."). Though Eaton was entitled to some notice of his termination hearing, the Due Process Clause does not prescribe a specific timeframe. Here, the notice Eaton received was adequate.

Eaton's arguments regarding the denial of his continuance requests also fail. As the Court has explained elsewhere, Eaton's belated request for a continuance on the day of his hearing was unreasonable. Moreover, "due process does not impose a strict requirement that plaintiff must be present," let alone testify, at the hearing. Calderon-Garnier v. Rodriguez, 578 F.3d 33, 39 (1st Cir. 2009). Eaton's counsel was given an opportunity to present Eaton's side of the story, and there is "nothing in the record to suggest plaintiff was so incapacitated that he could not communicate with his lawyer to make arguments on his behalf." Id. at 38. In fact, the undisputed evidence shows otherwise, as Eaton participated via affidavit in another BOS disciplinary matter just days before his own hearing. The denial of Eaton's first request for a continuance does not present a triable issue for similar reasons. The request, which was signed by Eaton and not his counsel, neither provided an adequate explanation for why a trial scheduled eleven days after the hearing necessitated a continuance, nor did it establish that Eaton would be disadvantaged by the denial.

Next, Eaton presents several arguments regarding the alleged bias of two of the decisionmakers, Clark and Smart.  As a general rule, "it is not required that a hearing be conducted before an 'impartial decisionmaker.'  In fact, the hearing may be presided over by the employer himself."  Acosta–Sepulveda v. Hernandez–Purcell, 889 F.2d 9, 12 (1st Cir.1989).  In some instances, however, bias can "be so severe as to interfere with due process at the hearing itself."  Chmielinski, 513 F.3d at 318.  "[A] plaintiff alleging impartiality must overcome the presumption that administrators are 'men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances, and must demonstrate an actual risk of bias or prejudgment.'"  Duhani v. Town of Grafton, 52 F. Supp. 3d 176, 182 (D. Mass. 2014) (quoting Jackson v. Norman, CIVA 0511429–RWZ, 2006 WL 1704296, at *1 (D. Mass. June 19, 2006)).

The present record does not support a finding that Smart was biased against Eaton, let alone that this alleged bias was "so severe as to interfere with due process at the hearing."  In support of his claim, Eaton points to instances when Smart became angry with him apparently due to the TPD's response to the recall movement.  Yet, such allegations do not give rise to an inference of inordinate bias, which can be inferred when the decisionmaker has a "pecuniary interest in the outcome" of the hearing or has been subject to "personal abuse or criticism from the party before him."  Withrow v. Larkin, 421 U.S. 35, 47 (1975).

Eaton contends that Clark's impartiality was tainted by his allegiance to his wife, who had sent Eaton a cease-and-desist letter three months before the hearing.  Yet, even when all reasonable inferences are drawn in his favor, Eaton's argument regarding Clark's bias fails.  Eaton has not established that Clark's supposed bias "deprived him of the opportunity to put his version of the facts before the decisionmaker, or that there was any error of primary facts in the

grounds used for termination that could be explained only by bias." Chmielinski, 513 F.3d at 318.  In any event, Clark was only one of three decisionmakers.  "The [three] member Board voted unanimously to terminate plaintiff.  Accordingly, [Clark's] alleged bias does not create a trial worthy issue regarding a lack of due process." Saltzman v. Town of Hanson, 935 F. Supp. 2d, 342 (D. Mass. 2013).

There is a further shortcoming in Eaton's claims of bias against Smart and Clark.  At the time Eaton received the notice of his disciplinary hearing, he was aware of all of the facts he now advances that he says give rise to bias.  At no time prior to or at the hearing did Eaton raise the question of bias, seek recusal of Clark or Smart, or otherwise request any action to address his concerns.  See Doc. No. 163-2 at 40 ¶ 77.  Thus, he waived this issue.

Next, Eaton contends that the BOS had made its decision prior to listening to the evidence at the hearing.  The Due Process Clause requires the decisionmakers, here the BOS, to listen to and consider the evidence offered.  At the hearing, Eaton offered no argument or objection to his termination whatsoever.  That alone defeats his sham hearing claim.   In essence, Eaton waived his right to any hearing or consideration at all in favor of litigating his request for a continuance.

Turning to the merits of his argument, Eaton argues that a reasonable inference of a sham hearing arises from the constellation of facts listed earlier in this section.  The Court disagrees. The facts merely show that, prior to the hearing, the BOS determined that the serious and credible allegations against Eaton warranted possible termination and the commencement of a hiring process in the event that Eaton was removed.  None of the facts presented give rise to an inference that the "[people] of conscience" the Court must presume occupied the BOS were unwilling to hear or to consider evidence or argument presented by Eaton at the hearing.

48

The case law is clear that the BOS was entitled to make preliminary findings as long as the ultimate termination decision was subject to revision.  See West v. Hoover, 681 F. App'x 13, 17 (1st Cir. 2017) (second alteration in original) (quoting O'Neill v. Baker, 210 F.3d 41, 49 (1st Cir. 2000)) ("[E]ven where a decision-maker makes the termination decision before the pre-termination hearing, and drafts a corresponding termination letter, '[t]here is no constitutional infirmity' as long as 'the planned termination was subject to revision.'"); O'Neill, 210 F.3d at 49 ("Instituting termination proceedings and preparing the necessary documentation in advance of the final pre-termination hearing are not deprivations of due process rights.").  Similarly, the decisionmakers, e.g., Smart in this instance, were entitled to take an initial stance on Eaton's termination as long as that stance was subject to change, which, for the reasons already stated, it was.

Indeed, the fact that Jenkins offered Eaton various opportunities to participate in the hearing cuts against the sham hearing claim.  There simply is a lack of evidence supporting the inference of a "sham."  Cf. Lawless v. Town of Freetown by & through Thomas, No. 18-CV-11089-IT, 2021 WL 878083, at *10 (D. Mass. Mar. 9, 2021) (determining that a disciplinary hearing was a sham when one decisionmaker stated during the hearing "why do we have to do this dog and pony show, let's just vote to terminate her and get it over with").

Because the Court finds that the hearing was constitutionally adequate, it need not reach the Defendants' additional arguments.  Accordingly, the Defendants' Motions for Summary Judgment on Eaton's procedural Due Process claim is ALLOWED.

B.    Substantive Due Process

Plaintiff's complaint also raises a substantive Due Process claim.  See Doc. No. 22 ¶ 115. The Defendants contend that Eaton has failed to satisfy the stringent "shocks to conscience"

standard governing such claims.  See Doc. No. 131-59 at 23 (citing Gianfrancesco v. Town of Wrentham, 712 F.3d 634 (1st Cir. 2013)).  Eaton does not contest Defendants' stance and makes no argument in favor of his substantive Due Process claim in his papers.  The Court thus considers this claim waived.  Even if Eaton had defended this claim, it would nevertheless fail because no reasonable juror could conclude that the Defendants' conduct was "truly outrageous, uncivilized, and intolerable."  Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999).

For the reasons stated herein, the Defendants' Motions for Summary Judgment on Count VII are ALLOWED.

## VIII.   COUNT IX: INTERFERENCE WITH CONTRACTUAL RELATIONS

Count IX is a claim for intentional interference with contractual and beneficial business relations against Clark and Kreidler.  Doc. No. 22 ¶¶ 124-28.

Eaton makes three overarching arguments in favor of his contractual interference claim: 1) Clark and Kreidler interfered with Eaton's employment by pressuring him to take improper actions against the TPD and creating a "hostile work environment," 2) Kreidler played a role in the BOS's decision to table Eaton's performance review and bonus as well as its ultimate decision to terminate Eaton, and 3) Clark voted to terminate Eaton's contract to retaliate against Eaton for his unwillingness to comply with Clark's demands.[25]

To withstand summary judgment, Eaton must establish a genuine dispute as to each of the following elements: "(1) that [he] had a business relationship, (2) that the defendant knew of this relationship, (3) that the defendant intentionally and maliciously interfered with the relationship, and (4) that the defendant's actions harmed [him]."  Zimmerman v. Direct Fed.

_____

[25] It is difficult to pinpoint Eaton's arguments in support of this claim because significant portions his briefs are dedicated to a lengthy narrative that is largely duplicative of his affidavit.  See Doc. No. 148-1 at 6-20.

Credit Union, 262 F.3d 70, 75 (1st Cir. 2001) (citing Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982)).  Where, as here, the plaintiff sues an official of the employer, he must satisfy an additional element: that the supervisor acted with "actual malice."  Id. at 76.  "Proof of actual malice requires more than a showing of mere hostility."  Id.  To meet this demanding standard, Eaton must "demonstrate that spite or malevolence, i.e., a purpose unrelated to any legitimate corporate interest, was the controlling factor in urging the plaintiff's discharge."  Alba v. Sampson, 690 N.E.2d 1240, 1242 (Mass. App. Ct. 1998) (emphasis added).  In addition, mere "personal dislike will not warrant an inference of the requisite ill will."  King v. Driscoll, 638 N.E.2d 488, 494 (Mass. 1994).

Eaton's claim fails for lack of actual malice.  Eaton cannot establish that Clark or Kreidler's actual malice, as opposed to a legitimate business reason or personal dislike, was the "controlling factor" in his termination.  Though Eaton might believe that Kreidler and Clark's illicit desire for revenge was the driving force in his removal, his theory fails in the face of undisputed evidence of Eaton's removal-worthy conduct.  See Sereni v. Star Sportswear Mfg. Corp., 509 N.E. 2d 1203, 1205 (Mass. App. Ct. 1987) (rejecting the plaintiff's "belief" that "age and ethnic bias" were the controlling factors behind his termination rather than his deficient performance).  In short, the BOS had a legitimate business reason, i.e., Eaton's unprofessional conduct, to push for his removal, and Eaton has failed to offer sufficient proof that actual malice was the true cause of his termination.[26]

---

[26] To the extent that Eaton argues that Kreidler interfered with Eaton's contract by allegedly "harassing" Eaton, rather than directly pushing for his termination, this argument also fails because Eaton does not explain how such conduct materially interfered with his ability to perform his employment contract.

Because the Court finds that Eaton's contractual interference claim fails on the merits, it need not reach the Defendants' additional arguments.  Accordingly, the Defendants' Motions for Summary Judgment on Eaton's contractual interference claim are ALLOWED.

IX.   <u>CONCLUSION</u>

In sum, the Defendants' Motions for Summary Judgment (Doc. Nos. 118, 122, 126, 129) are ALLOWED.  Judgment shall enter as described herein.  The Clerk shall close this case.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge